505 P.2d 1081

**Relus E. STEWART, an unmarried man, Appellant,**

v.

**Kenneth WOODRUFF and Lorene Woodruff, husband and wife, Appellees.**

**No. 2 CA–CIV 1246.**

Court of Appeals of Arizona, Division 2.

Feb. 2, 1973.

Rehearing Denied March 6, 1973.

Review Denied April 3, 1973.

Law Offices of David S. Wine, P. C. by Carol Wilson Druke, Tucson, for appellant.

William K. Richey, Tucson, for appellees.

HOWARD, Judge.

Plaintiff-appellee, Kenneth Woodruff, filed an action to quiet title by reformation of three deeds in which the descriptions were erroneously set forth and for an accounting of rents and profits against his uncle, Relus E. Stewart, defendant-appellant, based on a quit claim deed in which Stewart conveyed to Woodruff his interest in certain real property located in Pima County, Arizona.

The defendant counterclaimed for an adjudication that the property be deemed his and that the plaintiff account for rents and

**192**

profits from the property and improvements, claiming failure of consideration, misrepresentation, and want of capacity.

The facts considered in the light most favorable to upholding the judgment of the trial court are as follows. Relus E. Stewart is an unmarried man, 85 years of age. He acquired the subject property, presently a trailer court, in 1942, and has lived there since that time. He has approximately fifteen nieces and nephews, however, the only relative with whom he appears to have had a close relationship is Woodruff.

In 1961, Stewart visited Woodruff in Oklahoma. He asked Woodruff to consider coming to Tucson to rebuild his trailer court and knew that Woodruff was experienced in electrical and plumbing work. Stewart told his nephew that if he did so, he would certainly try to make it worth his while. Woodruff took this conversation to mean that Stewart would deed the trailer court to him.

In 1962, Woodruff went to Wickenburg, Arizona to work. On the way to Wickenburg, Woodruff with his wife and two daughters, stopped to see Stewart. Stewart told Woodruff that the health department was after him and that the trailer court would have to be rebuilt and rewired. He wanted Woodruff to stay and commence the work immediately. Woodruff told Stewart that he could not do so since he had an obligation in Wickenburg, but would consider coming back later.

Stewart visited Woodruff in Wickenburg and implored him to come to Tucson and work on the trailer court. Stewart stated that if the court wasn't rewired and replumbed the health department was going to condemn the property. Stewart promised Woodruff that if he came to Tucson to do the work he would see that Woodruff got the deed to the property later.

Woodruff came to Tucson with his family and lived on the subject property for sixteen or seventeen consecutive months during which time he installed electric wiring, plumbing equipment, septic tanks, and performed other jobs to keep the property from being condemned. Woodruff received no monetary payment during this period for his work. He testified that he worked on the property and used approximately $3,000 of his own funds for construction materials by reason of affection for his uncle as well as Stewart's promises that he was going to deed the property to Woodruff. Furthermore, during this period Woodruff's wife washed and ironed Stewart's laundry, prepared his meals, and worked in order to provide groceries for the Woodruff family as well as for Stewart.

After the work on the trailer court was completed, Stewart refused to deed the property to his nephew. Woodruff told his uncle that he would leave if Stewart did not keep his word. This had no effect on Stewart and the Woodruff family returned to Oklahoma.

Stewart telephoned Woodruff several times in Oklahoma and asked him to return to Tucson to take care of the property. Woodruff said that he would do so if Stewart would keep his word and sign a deed. Stewart refused to say that he would do this.

In July, 1968, Woodruff received a telegram from a trailer court tenant informing him that Stewart was sick and having trouble and was asking for Woodruff to come to Tucson. Within the same hour, Woodruff received a phone call from Pima County Hospital to the effect that Stewart was asking for him. Woodruff arrived in Tucson on July 7, 1968. He went to the hospital to see his uncle. When he approached Stewart in the hospital room, Stewart told him he was glad to see him and that he had made a great mistake. When Woodruff asked Stewart what he meant, Stewart said:

"I made a great mistake and after you left I got half mad and just give this property away. . . . Go get it back and have a new deed made and I will sign it to you. . . . I want you to have it all the way through, . . . I just got made when you left and just give it to them folks."

The "mistake" to which Stewart alluded occurred in April, 1968, when he deeded the property to an entity called the Free Will Aid Society which was to form a corporation, the purpose of which was apparently to provide shelter for indigent Christians on the subject property. The entity did not form a corporation or carry through with its plans.

Pursuant to his uncle's request, Woodruff succeeded in obtaining a deed back from the Society. Woodruff was named the grantee in this deed. The trial court determined that the deed from Stewart to the Free Will Aid Society was void for want of a proper grantee and therefore the deed from the Society to Woodruff was also void.

One day prior to the securing of the deed from the Free Will Aid Society, while hospitalized and in the presence of an attorney who had previously represented both parties, Stewart signed a quit claim deed to the property which is the subject of this appeal. Woodruff testified that when the attorney went to see Stewart in the hospital the attorney, at one point, asked Mr. Stewart if he knew what he was signing and that his answer was "yes, I do. I always wanted him to have it all the way through."

At trial Stewart testified that he did not recall signing the deed, and did not intend to sign a deed, thought that it was a will he was signing, but that the signature on the deed appeared to be his. Other facts necessary to the disposition of this case appear later in this opinion.

The crux of Stewart's position on appeal is that he did not knowingly or intentionally convey his property to Woodruff, and he presents four questions for review.

## I

### DID THE TRIAL COURT ERR IN DECIDING THAT THE GRANTOR HAD THE CAPACITY TO EXECUTE THE QUIT CLAIM DEED?

In order for a deed to be valid, it must be made voluntarily by a person of sound mind. 26 C.J.S. Deeds § 54a (1956).

The mental competence of the grantor at the time of delivery is a requisite element for the effective transference of ownership of land by deed. R. Powell, Powell on Real Property § 896 (1968). This court has stated that the determination of such competency depends upon whether or not the grantor understood and appreciated the nature of the conveyance and the court looks to all the circumstances of the deed execution in reaching this determination. Old age, sickness, eccentricity or senility alone do not amount to incompetency. Young v. Lujan, 11 Ariz.App. 47, 461 P.2d 691 (1969); Pass v. Stephens, 22 Ariz. 461, 198 P. 712 (1921).

At trial the attorney who prepared and notarized the deed signed by Stewart testified that he had known both parties for a number of years, was aware of their close relationship and knew that Woodruff had visited his uncle several times to help him repair his property. He also testified that he first visited Pima County Hospital before preparing the quit claim deed in order to talk with Stewart to be certain that he wanted his property transferred to Woodruff. The deed was signed on the attorney's second visit to Stewart with Mr. Woodruff present. The attorney stated that in his opinion Stewart knew what he was doing at the time he signed the quit claim deed and knew that it was a deed he was signing. The attorney also stated:

". . . I asked Mr. Stewart again if this whole transaction, if this is what he wanted and he said he wanted Kenneth to have the property. He looked very lucid to me. I have known him for a number of years. . . .

\*  \*  \*  \*  \*  \*

. . . I remember I repeatedly asked him if this was what he wanted to do and I felt certain that he knew what he wanted to do and I don't think I would have had this thing executed if I felt there was any question."

As part of Stewart's case, some neighbors and friends testified in substance that when they visited the appellant in the hospital he appeared to be under sedation and

was not capable, in their opinion, of transacting ordinary business. These witnesses, however, were not present at the time the deed was signed.

The trial judge concluded that a strong preponderance of the evidence showed that title should be quieted in the plaintiff Woodruff. Since we find sufficient evidentiary support for the ruling below, we will not interfere with the trial court's province when sitting without a jury to evaluate the weight of the evidence and determine the reasonable inferences to be drawn therefrom. Reynolds v. United Producers & Consumers Co-Operative, 17 Ariz.App. 145, 495 P.2d 1352 (1972).

## II

DID THE TRIAL COURT ERR IN DETERMINING THAT THE BURDEN OF PROOF OF LACK OF CAPACITY TO CONVEY WAS ON THE GRANTOR?

The general rule is that the burden of proving mental incapacity is on the person who attacks a deed which is valid on its face, since a grantor is presumed to have known the contents of a deed executed by him. 26A C.J.S. Deeds § 190a (1956). The deed will not be set aside because of invalidity except on a showing of clear and convincing proof. 26A C.J.S. Deeds § 208a (1956).

The appellant's position, however, is that the relationship between himself and Woodruff was one of confidence, thus raising a presumption of invalidity which would require a shifting of the burden of proving the grantor's competence to Woodruff, and that the ruling of the trial court was not a correct application of the law concerning the burden of proof. 26A C.J. S. Deeds § 208a (1956); R. Powell, Powell on Real Property § 884 (1968). *See also,* Smith v. Connor, 87 Ariz. 6, 347 P.2d 568 (1960).

Our disposition of Question I above is dispositive of Question II as well. The trial judge made an extensive oral ruling in which he advised the parties that he had considered all the evidence presented, including the relationship between Mr. Stewart and his nephew Woodruff, in determining whether or not Mr. Stewart was of sound and disposing mind in the conveyance of his property.

While appellant is correct in asserting that where a confidential relationship is shown the presumption of invalidity can be overcome only by clear and convincing evidence that the transaction was fair and voluntary, it is equally correct that the bare existence of a confidential relationship between grantor and grantee, standing alone, does not raise a presumption of fraud or coercion. A deed will not be set aside merely because the grantor and grantee sustained a confidential relationship where the evidence shows no abuse of confidence, and the mere fact that the grantor later changed his mind will not justify a court in undoing the grant. *See,* 26 C.J.S. Deeds § 58 (1956) and cases cited therein.

Where the trial court is correct in its final ruling, the reviewing court is bound to affirm, even though the trial court may have stated the wrong reason for its judgment. City of Tucson v. Morgan, 13 Ariz.App. 193, 475 P.2d 285 (1970); Rau v. Rau, 6 Ariz.App. 362, 432 P.2d 910 (1967). The trial court had before it evidence upon which an unprejudiced mind might reasonably reach the same conclusion which was reached. Smith v. Connor, supra.

## III

DID THE TRIAL COURT ABUSE ITS DISCRETION IN DENYING APPELLANT'S MOTION TO AMEND?

Subsequent to the pretrial conference and prior to trial, appellant submitted to the court a motion to amend his answer and counterclaim, consisting of approximately seven pages, to show the relationship between the parties and to add a request for relief by constructive trust. A copy of the motion reached the trial judge the afternoon prior to trial, and he assert-

ed his proper discretion in denying the motion to amend, advising the parties that they were bound by the pretrial order which had been issued pursuant to Rule 16(a), par. 6, 16 A.R.S., Ariz.R.Civ.P.

Appellant's position is that the amended pleading would only have served to clarify issues which were previously inferable and of no surprise to opposing counsel and that in the interest of justice the amendment should have been allowed.

We adhere to the rule that the reception of amended pleadings is within the due discretion of the trial court. Contractor & Mining Service & Supply, Inc. v. H. & M. Tractor & Bearing Corp., 4 Ariz.App. 29, 417 P.2d 542 (1966). We do not believe there was an abuse of discretion in the trial judge's refusal to permit Stewart to amend his pleading where the motion was filed well after the pretrial order was issued, especially considering that the appellant did not make a motion to amend his pleadings to conform to the evidence at the close of his case as permitted by Rule 15(b), Ariz.R.Civ.P. Assuming arguendo that the refusal to amend was error, it was not prejudicial error in view of the state of the evidence and the court's judgment.

## IV

### DID THE TRIAL COURT ERR IN EXCLUDING TESTIMONY AS HEARSAY?

Appellant contends that the trial court erred in excluding testimony of witnesses intended to show that Stewart, subsequent to signing the deed, disaffirmed any intention to convey the subject property. Appellant asserts that the testimony should have been allowed under the following rule of evidence:

"Declarations of a grantor disparging the grantee's title made after the former has parted with ownership are generally inadmissible. [footnote omitted] But there are three major exceptions where such evidence will be received: . . . (3) where the grantor remains in posses-

sion after transfer and makes such statements during such possession. [footnote omitted]" M. Udall, Arizona Law of Evidence § 181 at p. 403 (1960).

We first note that no offer of proof was made to the trial court when the objections were sustained. As a general rule a litigant may not assert as error the refusal of a trial court to allow a witness to answer a question or state particular facts unless counsel makes a timely offer of proof. Sulpher Springs Valley Electric Cooperative, Inc. v. Verdugo, 14 Ariz.App. 141, 481 P.2d 511 (1971). Assuming that the witnesses would testify as appellant maintains, there was no prejudicial error since the attorney who prepared the deeds testified that appellant later disaffirmed any intention to convey the subject property. The rejected evidence was merely cumulative.

The decision of the trial court quieting title in plaintiff-appellee Woodruff is therefore affirmed.

HATHAWAY, C. J., and KRUCKER, J., concur.